TERESA CRAMER vs. COMMONWEALTH.

Suffolk. October 5, 1994. - December 8, 1994.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Practice, Criminal*, Double jeopardy, Mistrial, Required finding. *Constitutional Law*, Double jeopardy. *Supreme Judicial Court*, Superintendence of inferior courts. *Homicide. Evidence*, Consciousness of guilt.

Principles of double jeopardy did not operate to bar the retrial of a defendant whose first trial on a charge of first degree murder had ended in a mistrial, where the Commonwealth had presented evidence at the trial legally sufficient to warrant a conviction. [109-113]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on September 3, 1993.

The case was heard by *Abrams*, J.

*James G. Reardon, Sr. (James G. Reardon, Jr.*, with him) for the defendant.

*Lynn Morrill Turcotte*, Assistant District Attorney, for the Commonwealth.

LIACOS, C.J. Teresa Cramer, whom we shall call the defendant, was tried in 1992 before a jury in the Superior Court on an indictment charging her with murder in the first degree of her eleven month old son, Joseph. See G. L. c. 265, § 1 (1992 ed.). The defendant moved for a required finding of not guilty. Mass. R. Crim. P. 25, 378 Mass. 896 (1979). The judge denied the defendant's motion and submitted the case to the jury. After deliberating for four days, the jury were unable to agree on a verdict; the judge then declared a mistrial. When the Commonwealth announced its intention to retry her, the defendant moved to dismiss the indictment on common law principles of double jeopardy, claiming that the Commonwealth's evidence at the trial was legally insuffi-

cient to warrant a conviction of murder in the first degree. The judge denied the motion.

The defendant next sought relief before a single justice of this court by means of a petition under G. L. c. 211, § 3 (1992 ed.).[1] The single justice held a hearing on the petition and entered a judgment, accompanied by a memorandum of decision, denying the petition. The defendant has appealed. We affirm the judgment of the single justice.

We summarize the evidence in the light most favorable to the Commonwealth. Joseph Cramer, the defendant's eleven month old son, died of extensive burns that covered most of his body from his midchest to his toes. Dr. Stanton Kessler, the medical examiner, testified that the child's burns were consistent only with his having been immersed by someone in hot water or liquid. Kessler stated that an immersion burn results when one person holds another in hot water or liquid for a period of time (at least ten seconds). He testified that, because the pattern of burning was "so specific for being immersed in a hot liquid," the burns could not have resulted from the child pulling a pot off the stove, or sitting under an overflowing sink, or climbing into a sink and turning the hot water on himself, or climbing into a sink already filled with hot water. He also testified that the child had a fresh bruise under his right eye and a two-inch abrasion on the right side of his neck.

Dr. Susan Briggs, attending general and vascular surgeon at Massachusetts General Hospital and Shriners Burn Institute; Dr. Gary Fudem, plastic and reconstructive surgeon at the University of Massachusetts Medical Center; and Dr. Frederico Gonzalez, a plastic and reconstructive surgeon and director of the burn center at the University of Massachusetts Medical Center, all opined that the child suffered an immersion injury by being immersed in hot water by another

---

[1] The defendant correctly invokes G. L. c. 211, § 3, to test her claim that a retrial would violate principles of double jeopardy. See *Koonce* v. *Commonwealth*, 412 Mass. 71, 71-72 (1992); *Brown* v. *Commonwealth*, 407 Mass. 84, 85 (1990); *Aucella* v. *Commonwealth*, 406 Mass. 415, 416 (1990).

person for a period of time. The three doctors, like Kessler, discounted other causes of injury. Dr. John Edelsberg, who treated the child in the emergency room at Worcester City Hospital, was of the same opinion.

Contessa Sierra (Contessa), the child's aunt, age fourteen at the time of the trial in 1992, testified that she, the defendant, and Contessa's three nephews (Joseph, Travis, and Christopher) were at home on the afternoon of November 26, 1989. Contessa and the defendant decided to clean the house. Contessa went into the pantry to do the dishes, while the defendant tried to "settl[e] down" the "rowdy" children. A few minutes later, Christopher ran to the pantry and told Contessa that the child was sitting in the bathroom sink crying. Contessa found the child in the sink, making moaning noises. She grabbed the child out of the sink, gave him to the defendant, and called an ambulance. Contessa denied that she had immersed the child in the hot water.

There was evidence that the hot water temperature coming from the faucet into the bathroom sink was 145 degrees Fahrenheit, a temperature sufficient to burn the child. Further, there was evidence that pieces of skin and traces of blood were found in the bathroom sink.

Several witnesses testified to the defendant's conflicting explanations concerning how the child had been burned. Officer Herbert Campbell, the first police officer to arrive at the scene, testified that the defendant told him that "the sink overflowed with hot water on top of the baby." Paramedic Brian Major testified that, when he questioned the defendant about the child's injury, she told him that "the child pulled a pot of water on him[self]." Christine Ahern, an emergency room nurse, testified that the defendant stated that the child "liked to climb up from the toilet seat into the sink and go into the sink. And that apparently . . . he climbed up on the toilet seat and turned on the water and fell into the sink." Laurie D'Errico, an intensive care nurse, testified that the defendant explained that she had found the child in the kitchen, "sitting on the counter with his clothes on soaking wet and the hot water faucets were turned on and the water

was running." Mary Mercurio, a child abuse investigator for the Department of Social Services, testified that the defendant told her that she found the child "sitting in the bathroom sink with the hot water running and overflowing onto the floor." Mercurio also testified that the defendant told her that she had never seen the child climb onto the toilet or into the sink.

Lisa Currier testified that she had known the defendant for several years and that the two women had lived together for some time in 1987 and again in 1988. Currier and the defendant met again on January 6, 1990, in the day room at the Massachusetts Correctional Institution at Framingham, where Currier was incarcerated and the defendant was being held on bail for the charges stemming from the child's death. Currier testified that the defendant told her that the defendant and her sister were cleaning in the kitchen when the telephone began to ring. The child was sitting on the counter. When he started to cry, the defendant screamed at him and put him in the water. Currier also testified that, when she and the defendant lived together, Currier had seen the defendant shake the child and scream at him on one occasion. On another occasion, the defendant picked the child up by his neck and screamed at him.

The question before us is whether the single justice acted properly in denying the defendant's petition. We conclude that the single justice did not err.

We begin by enunciating the applicable standards in the case. When a defendant's trial ends in a mistrial because the jury are unable to reach a verdict, double jeopardy principles do not bar retrial as long as the Commonwealth presented evidence at trial legally sufficient to warrant a conviction. *Berry* v. *Commonwealth*, 393 Mass. 793, 794 (1985). In making a determination whether the Commonwealth presented sufficient evidence to support a finding of guilt, we apply the standard articulated in *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), and used in reviewing the denial of a motion for a required finding of not guilty. Under that standard, "[The] question is whether, after view-

ing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore, supra* at 677, quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319 (1979). We consider the evidence "notwithstanding the contrary evidence presented by the defendant," whether by cross-examination or in the defendant's direct case. See *Commonwealth* v. *Latimore, supra.* In assessing the sufficiency of the evidence, we resolve questions of credibility in the Commonwealth's favor. *Commonwealth* v. *Dilone,* 385 Mass. 281, 286 (1982). *Commonwealth* v. *Medina,* 380 Mass. 565, 573 (1980).

Circumstantial evidence is sufficient to establish guilt beyond a reasonable doubt, even for the conviction of the highest crimes. *Commonwealth* v. *Chipman,* 418 Mass. 262, 268 (1994). *Brown* v. *Commonwealth,* 407 Mass. 84, 85 (1990). "In cases in which [t]he evidence [is] largely circumstantial . . . it is not essential that the inferences drawn should be only necessary inferences . . . . It is enough that [the inferences] be reasonable and possible." *Brown* v. *Commonwealth, supra* at 89, quoting *Commonwealth* v. *Merrick,* 255 Mass. 510, 514 (1926). "To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies.'" *Commonwealth* v. *Wilborne,* 382 Mass. 241, 245 (1981), quoting *Commonwealth* v. *Amazeen,* 375 Mass. 73, 81 (1978).

We conclude that the evidence was legally sufficient to permit a rational jury to find beyond a reasonable doubt that Teresa Cramer was guilty of murder in the first degree. First, five medical experts testified that the child died of burns caused by someone who immersed him in hot water or liquid for a period of time. The expert testimony indicated that the child's burns were intentionally, rather than accidentally, inflicted. In addition, four of the Commonwealth's medical experts discounted the defendant's various explanations of how the child was burned. The evidence of a bruise under the eye and of an abrasion to the neck tends to corroborate these views. From this evidence, a jury could draw the

reasonable inference not only that the child was murdered, but that the defendant was the person who intentionally immersed him in hot water or liquid. "An inference, if not forbidden by some rule of law, need only be reasonable and possible; it need not be necessary or inescapable." *Commonwealth* v. *Beckett*, 373 Mass. 329, 341 (1977).

Second, five witnesses testified to the defendant's conflicting explanations about how the child was burned. Inconsistent statements may be interpreted as showing consciousness of guilt. See *Commonwealth* v. *Healy*, 393 Mass. 367, 383 (1984). "Evidence of consciousness of guilt, while not conclusive, may, with other evidence, be sufficient to prove guilt." *Commonwealth* v. *McGahee*, 393 Mass. 743, 750 (1985), quoting *Commonwealth* v. *Swartz*, 343 Mass. 709, 713 (1962). See *Commonwealth* v. *Epsom*, 399 Mass. 254, 259 (1987) ("consciousness of guilt, together with other evidence, may establish guilt").

Third, Lisa Currier testified that she had observed the defendant's violent reaction in the past when the child cried, and that the defendant told her that on November 26, 1989, she had put the child in the hot water when he cried.[2]

The defendant contends that, because Contessa Sierra had equal access to the child at the time in question, the Commonwealth failed to prove beyond a reasonable doubt that the defendant, and not Contessa, murdered the child.[3] We

[2] The defendant argues that Currier's testimony was unreliable and therefore cannot serve as the basis of a conviction. The determination of the weight and credibility of the evidence is within the province of the jury. *Commonwealth* v. *Lydon*, 413 Mass. 309, 311 (1992). *Commonwealth* v. *Martino*, 412 Mass. 267, 272 (1992). *Commonwealth* v. *Nardone*, 406 Mass. 123, 129-130 (1989).

[3] The defendant also asserts that the Commonwealth called Contessa Sierra to the stand for the sole purpose of impeaching her with subsequent testimony and showing that she was not in the apartment at the time of the incident. We disagree. A review of Contessa's testimony indicates that she was not called solely to impeach her with her prior inconsistent statements. Contessa testified to the defendant's presence in the apartment on the day in question. She testified to the child's motor abilities. She testified to the events immediately preceding and following the incident. Thus, Contessa added considerable evidence that had significance apart from her

have held, however, that "[i]n order to convict on circumstantial evidence, it is not necessary to show that it was not in the power of any other person than the defendant to commit the crime." *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965), quoting *Commonwealth* v. *Leach*, 156 Mass. 99, 101-102 (1892). See *Brown* v. *Commonwealth*, *supra* at 89; *Commonwealth* v. *Rojas*, 388 Mass. 626, 629 (1983). That another (Contessa) may have had the opportunity to commit the crime goes only to the weight of the evidence, which is an issue for the jury. See *Commonwealth* v. *McGahee*, *supra* at 750, citing *Commonwealth* v. *Montecalvo*, 367 Mass. 46, 55-56 (1975).

The defendant's final assertion is that the Commonwealth's proof deteriorated after the prosecution rested its case and that therefore the Commonwealth's evidence was legally insufficient to support a guilty verdict. In evaluating the sufficiency of the Commonwealth's evidence, we consider the evidence introduced up to the time that the Commonwealth rested and the defense filed its first motion for a required finding of not guilty. *Brown* v. *Commonwealth*, *supra* at 85, quoting *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 (1976). *Commonwealth* v. *Chatfield-Taylor*, 399 Mass. 1, 4 (1987). *Commonwealth* v. *Casale*, 381 Mass. 167, 168 (1980). The defendant's rights become fixed at that time, unless they deteriorate at the end of all the evidence. *Brown* v. *Commonwealth*, *supra.* As we have discussed, the Commonwealth's evidence was legally sufficient to warrant a verdict of guilty of murder in the first degree. Furthermore, contrary to the defendant's contention, the Commonwealth's proof did not deteriorate after it rested. Although the defense witnesses did present testimony that contradicted the testimony of certain prosecution witnesses, the mere fact of contradiction does not mean that the Commonwealth's proof deteriorated.

---

prior inconsistent statements. The facts here are distinguishable from those in *Commonwealth* v. *Benoit*, 32 Mass. App. Ct. 111, 116-117 (1992), a case on which the defendant relies.

Instead, the determination of which testimony to believe is left to the jury.

This is not a case where, on all the evidence, the question of the defendant's guilt was left to conjecture or surmise. The evidence, and reasonable inferences from that evidence, would have permitted a reasonable jury to find that the defendant immersed the child in hot water or liquid and held him there for a period of time and that the baby died as a result of those immersion burns. See *Commonwealth* v. *Rojas, supra* at 630. Because the evidence presented was legally sufficient to warrant a finding of the defendant's guilt, we affirm the single justice's denial of the defendant's petition to dismiss the indictment. Trial of the case is to proceed in the Superior Court.

*So ordered.*