COMMONWEALTH *vs.* WILLIAM G. BROWN, JR.

No. 97-P-2343.

Barnstable. November 9, 1998. - May 30, 2001.

Present: JACOBS, PORADA, & RAPOZA, JJ.

*Motor Vehicle,* Operating under the influence. *Practice, Criminal,* Required finding, Complaint, Discovery.

Roads on the grounds of a military installation that were extensively used by the public, that were paved and contained multiple lanes of travel, and that had painted lines, guard rails, stop signs, speed limit signs, and blinking red and yellow lights, were ways or places "to which members of the public have access as invitees or licensees" within the scope of G. L. c. 90, § 24(1)(*a*)(1), with respect to the operation of motor vehicles by persons under the influence of intoxicating liquor. [709-713]

At a jury-waived trial of a defendant arrested on the grounds of a military installation for operating a motor vehicle while under the influence of intoxicating liquor, there was no error in the judge's denial of the defendant's motion for a required finding of not guilty, where the evidence was sufficient to warrant a rational trier of fact in concluding beyond a reasonable doubt that the defendant was guilty of operating a motor vehicle while under the influence of intoxicating liquor upon a way to which members of the public have access as invitees or licensees. [713]

At a criminal trial, the judge did not err in refusing to order the defendant's acquittal on the ground that the proof at trial regarding the location of the offense did not conform to what was contained in the complaint or the discovery provided by the Commonwealth, where the information contained in both the complaint and a police report enabled the defendant to understand the charge against him and to prepare his defense. [713-714]

COMPLAINT received and sworn to in the Falmouth Division of the District Court Department on June 11, 1997.

The case was heard by *Richard P. Kelleher,* J.

*Leonard M. Bello* for the defendant.

*Linda A. Wagner,* Assistant District Attorney, for the Commonwealth.

RAPOZA, J. Following a bench trial in the District Court, the

defendant was convicted of operating a motor vehicle while under the influence of intoxicating liquor. G. L. c. 90, § 24.[1] In order to sustain a conviction for this offense in the circumstances of the present case, the Commonwealth must prove that the defendant's impaired operation occurred "upon any way or in any place to which members of the public have access as invitees or licensees." G. L. c. 90, § 24(1)(*a*)(1), first par., as appearing in St. 1994, c. 25, § 3.[2] The defendant contends that this requirement was not established by proof beyond a reasonable doubt and that, consequently, the trial judge's denial of his motion for a required finding of not guilty pursuant to Mass.R. Crim.P. 25(a), 378 Mass. 896 (1979), constituted error. He also asserts that it was error for the trial judge not to have ordered his acquittal where, he claims, the proof at trial did not conform either to the complaint or the discovery supplied by the Commonwealth. We affirm.

*Procedure*. The defendant made an oral motion for a required finding of not guilty at the close of the Commonwealth's case. The defendant then asked the trial judge to reserve his ruling on the motion[3] and proceeded to call a single witness, following

[1]The defendant also faced charges of operating an unregistered motor vehicle and operating an uninsured motor vehicle, which were dismissed at the request of the Commonwealth. Following the bench trial and with the defendant's consent, the judge entered a guilty finding and placed on file a charge of operating a motor vehicle with a suspended license.

[2]The trial judge made a written finding that the defendant operated his motor vehicle "on a public way, *or* in a place to which the public has a right of access, *or* upon a way or in a place to which members of the public have access as invitees or licensees" (emphases supplied). Although the parties allude to the first two grounds, they treat this appeal as turning on whether the defendant operated his motor vehicle on a way "to which members of the public have access as invitees or licensees" and it is to that issue that we direct our attention.

[3]Rule 25(a) states unambiguously that "[i]f a defendant's motion for a required finding of not guilty is made at the close of the Commonwealth's evidence, it shall be ruled upon at that time." Accordingly, the trial judge should have ruled on the motion at the time it was made. *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. 545, 548 (1996). Nonetheless, the judge's action is without consequence where it was the defendant who asked him to defer his ruling on the motion. See *Commonwealth* v. *Cote*, 15 Mass. App. Ct. 229, 240-241 (1983). The rule "protects a defendant's right to insist that the Commonwealth present proof of every element of the crime . . . before he decides whether to rest or to introduce proof." *Id*. at 240. We discern no

which he rested and the judge heard his motion for a required finding.[4] Upon the judge's statement that he intended to take the motion under advisement, the defendant asked that he reserve the entire matter and enter a finding of not guilty should the motion be denied. Thereafter, the judge denied the defendant's motion for a required finding and the defendant filed a motion for reconsideration. Upon agreement of the parties, the judge effectively allowed the motion to reconsider without so stating and reopened the evidence to permit both parties to file supplementary affidavits relating to the status of the roadways in issue. After considering the additional affidavits, the judge denied the renewed motion for a required finding and entered a finding of guilty.[5]

*Facts.* We summarize the evidence most favorable to the Commonwealth. On June 11, 1997, shortly after midnight, the defendant was arrested by a Massachusetts State police trooper on the grounds of the Otis Air National Guard Base (air base) for operating a motor vehicle while under the influence of

prejudice to the defendant where he was the party who requested that the judge reserve judgment. Compare *Commonwealth* v. *Preston*, 393 Mass. 318, 321 n.2 (1984) (neither the Commonwealth nor the defendant objected when the judge reserved judgment on the defendant's motion at the close of the Commonwealth's case).

[4]When the judge eventually considered the defendant's motion he did not indicate whether he was treating it as a motion for a required finding at the close of the Commonwealth's case or as a renewed motion at the close of all the evidence. He did, though, entertain argument that referenced evidence from the defendant's witness, leading us to conclude that he considered the motion as one brought at the close of all the evidence.

[5]Having entertained the motion for a required finding in light of the new affidavits from both sides, it would appear that, once again, the judge treated the motion as one filed at the close of all the evidence. However, there would be no difference in the outcome of this case had the judge considered the motion at the close of the Commonwealth's case, rather than at the close of all evidence, because the affidavits and other evidence presented by the defendant did not result in a deterioration of the Commonwealth's case. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976); *Commonwealth* v. *Walker*, 401 Mass. 338, 343 (1987). Although the affidavits supplied by the defendant contradicted the testimony of Commonwealth witnesses in some respects, "the mere fact of contradiction does not mean that the Commonwealth's proof deteriorated." *Cramer* v. *Commonwealth*, 419 Mass. 106, 112 (1994). See also *Commonwealth* v. *Hastings*, 22 Mass. App. Ct. 930, 931 (1986) (" 'Deterioration' does not mean a conflict in the evidence which arises in the course of the defendant's case").

intoxicating liquor. The air base is located on the Massachusetts Military Reservation (reservation) on Cape Cod. The trooper was called to the scene by military security police who had stopped the defendant's vehicle after it sped past a guardhouse and proceeded through a security gate into the restricted air base.

The air base is a highly secure, enclosed area containing approximately 3,600 acres within the larger reservation. The base houses the 102d Fighter Wing, which maintains seventeen F-15 fighter jets at that location. It is surrounded by a perimeter fence and is guarded by armed Massachusetts Air National Guard security officers twenty-four hours a day. Access to this area is highly restricted. It was on these premises that the defendant was ultimately stopped and detained by security police.

When the defendant was first observed, he was driving through the reservation at a fast rate of speed on South Outer Road which leads to the air base. He was seen by an armed Massachusetts Air National Guard security officer who was stationed in a guardhouse located at the front gate of the base. The front gate of the air base is located on South Outer Road at a point approximately sixty to seventy yards from where that road intersects Simpkins Road. Simpkins Road begins at the Falmouth entrance to the reservation[6] and continues to the intersection with South Outer Road.

The two intersecting roads, like the other roadways of the reservation, are paved with asphalt. Each has two lanes traveling in opposite directions separated by a painted median line. The edges of both roads are outlined with painted lines, and guardrails are installed at different locations along the sides of each. There is a set of blinking red and yellow traffic lights where the roads intersect.[7] As are the other roadways in the reservation, Simpkins Road and South Outer Road are plowed

---

[6]The three entrances to the reservation are located in Falmouth, Sandwich, and Buzzards Bay, respectively, and can be directly accessed from public roads.

[7]Both stop signs and speed limit signs are posted throughout the reservation, although there was no direct evidence that such traffic controls were specifically located on either Simpkins Road or South Outer Road.

and maintained by the Massachusetts Army and Air National Guard. They are also routinely patrolled by the Massachusetts State police, who enforce the traffic control provisions of G. L. c. 90 with respect to motorists using the roadways of the reservation.

The defendant apparently passed through the Falmouth entrance to the reservation and proceeded up Simpkins Road to the intersection with South Outer Road. He then turned right and proceeded down South Outer Road in the direction of the guardhouse at the front security gate of the air base.[8] When he arrived at the guardhouse, he stopped his car and was questioned by a security officer concerning his presence at the air base. The guard observed that the defendant was "starry eyed," smelled strongly of alcohol, and was slurring his words. The defendant was asked for identification and, when questioned further, claimed that he was going fishing. The defendant was told that the area beyond the guardhouse was a restricted zone and that he needed to pull his vehicle over to the side of the road. When the guard walked around to the driver's side of the vehicle, the defendant sped off into the restricted area. Military personnel were then notified that an unauthorized individual had entered the air base through the security gate.

The defendant was pursued through the restricted area by security police. Ultimately, the defendant pulled his vehicle into a parking lot and stopped. The security police called the Massachusetts State police and, approximately fifteen minutes later, a State trooper arrived at the air base. The trooper observed that the defendant's eyes were bloodshot and watery, there was a strong odor of alcohol coming from within the car, and, when the defendant got out of the vehicle, he was unsteady on his feet and had to hold onto his car to maintain his balance. The trooper also observed several empty beer cans in the back seat of the defendant's car as well as a bottle of wine and an open twelve-pack of beer. The defendant failed to perform satisfacto-

---

[8]From his vantage point, the officer could see a considerable distance down South Outer Road, which was relatively straight. The sudden appearance of the defendant's car in close proximity to the front gate of the air base supports the inference that it had turned onto South Outer Road from Simpkins Road.

rily a series of field sobriety tests and was placed under arrest for operating a vehicle under the influence of alcohol.[9]

The reservation, on which the air base is located, is an area consisting of approximately 22,000 acres of land owned by the Commonwealth and spanning several towns, including Falmouth, Bourne, Mashpee, and Sandwich. The majority of the acreage of the reservation is leased to the United States government, which also holds title to several parcels within the reservation. Since 1974, the primary Federal presence on the reservation has been the United States Air Force, which, at a point, withdrew from the site. Other Federal activities continue to be located on the reservation, including a national cemetery operated by the Veterans Administration; base housing for certain military personnel and their families; a Coast Guard exchange open to military personnel and their families; and office space and other facilities used by various Federal agencies such as the Department of Agriculture. Currently there are also three military commands remaining on the reservation, the Massachusetts Air National Guard, the Massachusetts Army National Guard and the United States Coast Guard. The reservation has also hosted numerous other facilities, including three town of Bourne public elementary schools, a Bourne public junior high school, a little league baseball field, a BMX bike facility; the Otis Golf Club, a waste transfer facility, and a wastewater treatment plant.

Those who routinely enter the reservation and travel its roadways include, in addition to military personnel and their families, visitors to the national cemetery, members of the Otis civilian advisory council, persons going to one of the Bourne public schools on the reservation (including students, teachers, administrators, support staff, and parents), persons using the little league field and the BMX bicycle facility, applicants for commercial driver's licenses who are evaluated at a State police test site on the reservation, persons issued permits to hunt deer

[9]Although arrested inside the air base, the defendant was charged with operating while under the influence of intoxicating liquor in Falmouth and was tried on the theory that his impaired operation occurred while he traveled through the reservation on Simpkins Road and South Outer Road on his way to the base.

on the reservation by the Massachusetts Division of Fisheries and Game, persons invited by members of the Otis Golf Club to visit that facility, and guests of military personnel and residents of base housing. Moreover, members of the public routinely travel through the reservation as a shortcut to destinations elsewhere on Cape Cod, with the flow of traffic (consisting primarily of private passenger vehicles and taxicabs) usually being heaviest on Friday and Saturday nights.[10]

In addition to private vehicles, commercial vehicles also traverse the roadways of the reservation, including vehicles making commercial deliveries to various locations on the reservation, trucks of contractors delivering waste materials to the waste transfer facility, vehicles for package delivery services such as Federal Express and United Parcel Service, mail trucks for the United States Postal Service, tow trucks, trucks belonging to electrical contractors and carpenters, construction vehicles and trucks belonging to contractors involved in restoration work on the reservation.[11]

Cars and trucks gain access to the reservation through the three entrances located around its perimeter. There is both a guardhouse and a gate located at each entrance; the guardhouses have been unmanned since 1995, and each gate is routinely left in the "open" position. There is no access to the reservation except by means of one of the three gates through which any person seeking to enter the reservation may pass unimpeded. Several unilluminated signs are present at each entrance, some apparently dating to the period when the United States Air Force maintained an active presence on the reservation. One

---

[10]The State trooper who arrested the defendant, when asked to characterize the traffic which he encountered on the reservation during his routine patrols, described it as "normal everyday traffic."

[11]When the judge reopened the evidence, the Commonwealth submitted the affidavit of Brigadier General William R. LaBrie of the Massachusetts Army National Guard. General LaBrie is the executive director of the special military reservations commission, which deals with issues concerning the use of reservation land and related matters. He stated: "Although the public, in general, is not authorized access to the [reservation], *specific members of the general public may be authorized access under the conditions of being invitees or licensees*" (emphasis supplied). He then described the different authorized groups of visitors to the reservation and categorized them as either invitees or licensees.

warns that persons entering the gate require permission of the commander of the "U.S. Air Force Installation," which is no longer extant. Similarly, next to each vacant guardhouse is a sign indicating "authorized personnel only" and "ID card and or decal required." (We note that, in the absence of a guard regularly posted at that location, there is no mechanism for determining whether a person entering the reservation has the described documentation.) Finally, a smaller "no trespass" sign is also located in the vicinity of each gate.

*Discussion.* The defendant argues that, as a matter of law, the road upon which he was traveling was not a way to which members of the public had access as invitees or licensees. Consequently, he claims that it was error for the judge to deny his motion.

"In evaluating the sufficiency of the Commonwealth's evidence, we consider the evidence introduced up to the time that the Commonwealth rested and the defense filed its first motion for a required finding of not guilty." *Cramer* v. *Commonwealth*, 419 Mass. 106, 112 (1994). We regard the evidence at that stage "in a light most favorable to the government, without weighing contrary evidence presented by the defense." *Commonwealth* v. *Hart*, 26 Mass. App. Ct. 235, 236 (1988). "We [then] consider the evidence at the close of all the evidence to determine whether the Commonwealth's position as to proof had deteriorated since it had closed its case." *Commonwealth* v. *Basch*, 386 Mass. 620, 622 n.2 (1982). In doing so, we again view the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Walker*, 401 Mass. 338, 343 (1987). See *Commonwealth* v. *Kelley*, 370 Mass. 147, 150 n.1 (1976); *Commonwealth* v. *Amazeen*, 375 Mass. 73, 80-81 & n.5 (1978).

Whether the Commonwealth has proved, beyond a reasonable doubt, that the defendant's impaired operation occurred on a way to which members of the public have access as invitees or licensees constitutes a legal conclusion rather than a factual finding. On the record before us, "we are in as good a position as the judge to evaluate the strength of the defendant's claims with respect to the correct application of the law to the facts." *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. 545, 549 (1996),

citing *Director of the Div. of Employment Security* v. *Mattapoisett*, 392 Mass. 858, 862 n.5 (1984). "Thus, while we give substantial deference to the judge's ultimate findings, *Commonwealth* v. *MacNeill*, 399 Mass. 71, 76 (1987), his legal rulings and conclusions of law are subject to our independent review. *Ibid. Commonwealth* v. *Eagles*, 419 Mass. 825, 832 n.9 (1995). *Commonwealth* v. *Selby*, 420 Mass. 656, 657 (1995). *Commonwealth* v. *Chadwick*, 40 Mass. App. Ct. 425, 427-428 (1996)." *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. at 549.

In considering whether the defendant was operating "upon any way or in any place to which members of the public have access as invitees or licensees," G. L. c. 90, § 24(1)(a)(1), it is settled law that "[i]t is the status of the way, not the status of the driver, which the statute defines . . . ." *Commonwealth* v. *Hart*, 26 Mass. App. Ct. at 237-238. See *Commonwealth* v. *Callahan*, 405 Mass. 200, 201, 206 (1989); *Commonwealth* v. *George*, 406 Mass. 635, 639 (1990); *Commonwealth* v. *Muise*, 28 Mass. App. Ct. 964, 965 (1990); *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. at 549-550.

In *Hart*, *supra*, the defendant was charged with operating his motor vehicle under the influence of intoxicating liquor while on a private way, but one to which members of the public had access as invitees or licensees. Although in *Hart* the defendant was employed by a business abutting the private way (indeed, his ill-fated trip began in his employer's parking lot adjacent to the way), our decision in that case did not turn on whether the defendant was himself an invitee or licensee on the premises. Indeed, we concluded that "[n]o specific license or invitation need be granted to the particular driver charged with violating the statute . . . ." *Id.* at 238. Rather, we observed that the way in question came within the scope of the statute if the circumstances of the way were such that "members of the public may reasonably conclude that it is open for travel to invitees or licensees of the abutters." *Ibid.*

We look at the "characteristics of the way" that place it within the reach of the statute, *id.* at 237, and conclude that the roads of the reservation all share a number of traits indicating their accessibility to the public. In addition to being extensively used by business visitors and others, they are paved and contain

multiple lanes of travel. They also have painted lines, guard rails, stop signs, speed limit signs, and blinking red and yellow lights. See *Commonwealth* v. *Hart*, 26 Mass. App. Ct. at 237 (characteristics included "intersecting streets, general use by the public, a broad category of business visitors, and only occasional closing off [if any]" of the way). See also, for indicia of accessibility to the public, *Commonwealth* v. *Mara*, 257 Mass. 198, 209 (1926) (street lights, paving, curbing, houses, crossroads, traffic); *Commonwealth* v. *Charland*, 338 Mass. 742, 744 (1959) (signs, flashing yellow light, curbing, crossroads); *Commonwealth* v. *Colby*, 23 Mass. App. Ct. 1008, 1010 (1987) (paving, street lights, hydrants). Compare *Commonwealth* v. *Callahan*, 405 Mass. at 205 (privately owned sand pits not property to which members of the motoring public have access as licensees or invitees); *Commonwealth* v. *George*, 406 Mass. at 637-639 (a public school baseball field is not a way to which members of the public have access by motor vehicle as invitees or licensees); *Commonwealth* v. *Smithson*, 41 Mass. App. Ct. at 550-551 (road leading to sand pit accessible to the public during business hours of private sand and gravel company [posted on sign], but, where accident occurred on a holiday when business was closed, the road was not then a way to which members of the public had access as licensees or invitees).

The Commonwealth also presented evidence establishing that the roads of the reservation are in fact accessed by numerous persons as invitees or licensees of the various institutions and enterprises located there. Indeed, the universe of people that routinely travels the roadways of the reservation is considerable and is commensurate with the many activities on the site that involve participation by the public such as public schools, a golf club, a baseball field, a recreational bike facility, hunting areas, government offices, and a national cemetery. In addition, those facilities are also serviced by business and commercial vehicles, constituting another source of public access to the reservation. See *Commonwealth* v. *Hart*, 26 Mass. App. Ct. at 237 (invitees or licensees in question were "[e]mployees, customers, service personnel, vendors, deliverymen, and other callers with a business purpose [who] used the private stretch of [road] to reach their destinations").

The defendant cites the existence of the restrictive signage posted at the entrances to the reservation to support his assertion that the roads within its borders are not ways to which members of the public have access as invitees or licensees. In support of his claim he cites *Commonwealth* v. *Callahan,* 405 Mass. at 206, but his reliance on that case is misplaced. In *Callahan,* 405 Mass. at 202-204, the court considered whether the sandpits on which members of the public sometimes rode recreational vehicles without permission of the owner, and on which the defendant had driven his motor vehicle, also without the owner's permission, constituted a way to which members of the public had access as invitees or licensees. The court concluded that the sandpits did not constitute such a way because *no* member of the public had permission to use the premises and, as a result, "members of the public had access to the property *only* as trespassers . . ." (emphasis supplied). *Id.* at 204. Necessarily, a way that is accessed only by trespassers is not one to which any members of the public have access as invitees or licensees. As stated in *Callahan,* such a way is outside the scope of the statute. *Id.* at 205.

That is not the case here. As we have noted, a considerable number of persons are authorized to, and routinely do, use the roadways of the reservation. Nor are such persons rendered trespassers by the presence of the restrictive signage at the three entrances to the reservation. Even if the roads of the reservation should be used by some members of the public who have no business there (and to whom the "no trespassing" signs would arguably apply) the roadways would nonetheless come within the embrace of G. L. c. 90, § 24, so long as there are "members of the public [who] have access as invitees or licensees." Thus, we need not consider the defendant's status at the reservation on the evening of his arrest. Even if he were not an invitee or licensee on the premises, his status as a possible trespasser would change nothing since it is the status of the way, and not of the driver, that is determinative. "No specific license or invitation need be granted to the particular driver charged with violating the statute, i.e., it is sufficient if . . . members of the public may reasonably conclude that [the way] is open for travel to invitees or licensees . . . ." *Commonwealth* v. *Hart,* 26

Mass. App. Ct. at 238. The fact that the roads of the reservation come within the statute means that the statute may be enforced even against an uninvited driver.

"The statute [G. L. c. 90, § 24,] was passed for the protection of travellers upon highways . . . ," *Commonwealth* v. *Connolly*, 394 Mass. 169, 172 (1985), quoting from *Commonwealth* v. *Clarke*, 254 Mass. 566, 568 (1926), and it must be analyzed in light of "the legislative purpose to protect the public from drivers whose judgment, alertness, and ability to respond . . . are diminished . . . ." *Commonwealth* v. *Connolly*, 394 Mass. at 172-173. Certainly those who travel the roads of the reservation as invitees or licensees are entitled to the protection offered by the statute, even against drivers who use the same roads without authorization.

There was no error in the judge's denial of the defendant's motion for a required finding of not guilty. The evidence was sufficient to warrant a rational trier of fact in concluding beyond a reasonable doubt that the defendant was guilty of operating a motor vehicle while under the influence of intoxicating liquor upon a way to which members of the public have access as invitees or licensees.

The defendant next contends that he is entitled to an acquittal because the proof at trial regarding the location of the offense did not conform to what was contained in the complaint or the discovery provided by the Commonwealth. Even if we assume that the defendant's argument rises to the level of appellate argument required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), we find no error.[12]

The complaint listed the "place of offense" as Falmouth. Although the State police report[13] indicates the place of the defendant's arrest as "Riley Street Otis AFB," it also contains a description of the defendant's operation of his motor vehicle

---

[12]The defendant's argument is conclusory and, in addition to being bereft of citation to any authority, does not allege any specific prejudice which he has experienced. See *Commonwealth* v. *Tracy*, 50 Mass. App. Ct. 435, 442 (2000) ("We note that the defendant has failed to cite to any authority in support of his argument, and the argument does not rise to the level of appellate argument cognizable by this court"). Nevertheless, we address the issue.

[13]The pretrial conference report indicated that the Commonwealth would supply the defendant written particulars including the date, time, and place of

prior to his arrest, from which it can plainly be inferred that he drove on the roadways of the reservation prior to his arrival at the guardhouse. Moreover, the report contains observations of the three Commonwealth witnesses who testified at trial, including those of the guard at the front gate describing how the defendant drove his car up to the air base, claimed that he was going fishing, smelled very strongly of an alcoholic beverage, and then accelerated his car and sped into the restricted area.

At trial the defendant was prepared to rebut that "Riley Street" on the air base was a public way in the town of Falmouth.[14] Nonetheless, as the trial transcript amply reflects, both the Commonwealth and the defendant were well aware that the issue before the trial court concerned the status of the ways between the entrance to the reservation and the security gate of the air base. The defendant cannot now claim to be surprised by the proof offered by the Commonwealth at trial. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 167, cert. denied, 525 U.S. 1007 (1998); *Commonwealth* v. *LePore*, 40 Mass. App. Ct. 543, 550 (1996). We conclude that the information contained in both the complaint and the police report enabled the defendant to understand the charge against him and to prepare his defense. See *Commonwealth* v. *King*, 387 Mass. 464, 468 n.2 (1982); G. L. c. 277, § 34, as appearing in St. 1979, c. 344, § 34 ("An indictment shall not be dismissed or be considered defective or insufficient if it is sufficient to enable the defendant to understand the charge and to prepare his defense . . ."). See also G. L. c. 277, § 35 ("A defendant shall not be acquitted on the ground of variance between the allegations and proof if the essential elements of the crime are correctly stated, unless he is thereby prejudiced . . . ."); Smith, Criminal Practice & Procedure §§ 734-735 (2d ed. 1983).

*Judgment affirmed.*

---

the offense. Apparently no bill of particulars was supplied, but a copy of the arrest report of the State trooper was provided to the defendant.

[14]The town engineer of Falmouth testified on behalf of the defendant that there was no "Riley Street" in that town.